Kevin H. Marino
John A. Boyle
John D. Tortorella
Anthony J. Tagliaferro
**MARINO, TORTORELLA & BOYLE, P.C.**
437 Southern Boulevard
Chatham, NJ  07928-1488
(973) 824-9300
*Attorneys for Plaintiff*
*Jeremiah Williams*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| **JEREMIAH WILLIAMS,**<br><br>**Plaintiff,**<br>**vs.**<br><br>**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,**<br><br>**Defendant.** | Civil Action No. _____<br><br><br><br>**VERIFIED COMPLAINT AND DEMAND FOR TRIAL BY JURY** |

Plaintiff, Jeremiah Williams ("Williams"), through his undersigned attorneys, by way of Complaint against Defendant, National Collegiate Athletic Association (the "NCAA"), alleges:

### SUMMARY OF THE ACTION

1.     This is an action for immediate and permanent injunctive relief, compensatory and punitive damages, and attorneys' fees and costs to enjoin and redress the NCAA's enforcement against Plaintiff, a member of the Rutgers University Men's Basketball Team, of transfer and restitution rules the NCAA has been enjoined from enforcing by Order of the United States District Court for the Northern District of West Virginia (the "West Virginia Injunction").

2.     The West Virginia Injunction, which was entered on December 13, 2023, enjoined the NCAA from enforcing: (a) a transfer rule that would otherwise have prevented Plaintiff and all similarly situated two-time transfer student-athletes from playing during the 2023-24 season;

and (b) a restitution rule that would have enabled the NCAA to punish such transfer student-athletes for playing—and penalize their universities for allowing them to play—in reliance on the West Virginia Injunction.  In entering that injunction, the Honorable John Preston Bailey, U.S.D.J., relied upon the United States Supreme Court's decision in *NCAA v. Alston*, 141 S. Ct. 2141 (2021), which rejected the NCAA's longstanding position that its amateurism rules were exempt from the Sherman Antitrust Act, 15 U.S.C. § 1 (the "Sherman Act"), and expressly held that those rules were indeed "subject to the Sherman Act … and the rule of reason" and were often plainly illegal. 141 S. Ct. at 2155-66.

3.      Last evening, the NCAA formally imposed a 15-game suspension on Plaintiff for violating its sports-wagering rule while a student-athlete at Iowa State University.  Plaintiff, who transferred to Rutgers from Iowa State after transferring to Iowa State from Temple University, has already served his 15-game sports-wagering suspension in anticipation of that announcement. Indeed, Plaintiff has sat out all twenty games Rutgers has played this year, the last five while waiting for the NCAA to formally impose the suspension it imposed last evening.  He is therefore now eligible to begin playing basketball for Rutgers.

4.      Rutgers is scheduled to play its next game at 4:00 p.m. on Saturday, February 3, 2024, against the University of Michigan, and Plaintiff wishes to play in that contest.  The NCAA has taken the position, however, that because its now-unenforceable transfer rule was in effect during the first nine games of the season: (a) those nine games do not count against his sports-wagering suspension; (b) Plaintiff must therefore serve his entire sports-wagering suspension based on games played after December 13, 2023, rather than receive credit for the nine games he sat out before that date; and (c) Plaintiff is therefore not eligible to play beginning with Saturday's game and will not be eligible to play for Rutgers until February 18, 2024.  The NCAA takes that

position despite having expressly acknowledged that Plaintiff was ineligible to play in the nine pre-West Virginia Injunction games he sat out by virtue of his sports-wagering suspension.

5.     For these reasons, Plaintiff respectfully requests that the Court temporarily, preliminarily, and permanently enjoin the NCAA: (a) to formally acknowledge that he has already served his full sports-wagering suspension and is therefore eligible to begin playing basketball for the Rutgers University Men's Basketball Team on Saturday, February 3, 2024; and (b) from imposing any penalty on Plaintiff under the NCAA's Rule of Restitution or otherwise.

6.     Unless enjoined in the manner requested above, the NCAA will deny Plaintiff the invaluable opportunity to fulfill his obligations to Rutgers University and its Men's Basketball Team; to realize the full economic value of his name, image and likeness; and to maximize his chances to play professional basketball upon graduation, all in service of a rule that a United States District Judge has already enjoined.  This action follows.

## THE PARTIES

7.     Williams is a citizen of the State of Illinois, a student-athlete enrolled at Rutgers University, and a member of the Rutgers University Men's Basketball Team.

8.     The NCAA is an unincorporated association headquartered in Indianapolis, Indiana that serves as the governing body of college sports.  It is, therefore, a citizen of the State of Indiana.

## JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over all claims at issue in this action pursuant to 28 U.S.C. §§ 1331, 1332 and 1367(a).  The Court has federal-question jurisdiction over Williams's claim for violations of the Sherman Act (Count One).  The Court has diversity jurisdiction over Williams's claim for breach of contract (Count Two) because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.  The

Court also has supplemental jurisdiction over Williams's breach-of-contract claim because it is so interrelated with his Sherman Act claim as to form part of the same case or controversy.

10.     This Court has personal jurisdiction over the NCAA because it and its member institutions currently engage in continuous and systematic business in the District of New Jersey, including athletic competitions, ticket and merchandise sales, television agreements and other revenue-generating activities, and have directed many of the specific acts alleged in the Complaint to Plaintiff within this District.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2)-(3) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District and because the NCAA is subject to personal jurisdiction in this District.

<u>**FACTUAL ALLEGATIONS**</u>

**A.  Williams's College Career And Gambling Conviction**

12.     Williams, who is 21 years old, grew up in Chicago, Illinois and attended Neal F. Simeon Career Academy, where he was a standout basketball player heavily recruited by numerous Division I basketball programs.  While in high school, Williams received scholarship offers from a number of college programs.  Ultimately, he chose to play college basketball at Temple University in Philadelphia, Pennsylvania, where he enrolled in the fall of 2020.

13.     After his second year at Temple, Williams transferred to Iowa State University for the 2022-2023 season.

14.     Between December 2022 and February 2023, Williams made a series of small wagers, each $20 or less, on various sporting events.  In total, Williams bet approximately $320 on college and professional sporting events.

15.     In September 2023, Williams pleaded guilty to underage gambling.

**B.  The Judicial Invalidation Of The NCAA's Transfer Eligibility Rule.**

16.     In the summer of 2023, Williams transferred from Iowa State to Rutgers.

17.     At the time Williams transferred to Rutgers, NCAA Bylaw 14.5.5.1—known as the "Transfer Eligibility Rule"—required student-athletes who, like Williams, transferred a second time to a third Division I program to sit out for an entire season of their sport after their transfer. Such second-time transfers are known as "4-4-4 transfer athletes" because they have transferred from one four-year school to a second four-year school and then to a third four-year school.

18.     On December 7, 2023, the Attorneys General of Ohio, Colorado, Illinois, New York, North Carolina, Tennessee and West Virginia (the "State AGs") filed an antitrust action in the United States District Court for the Northern District of West Virginia under the caption *State of Ohio, et al. v. National Collegiate Athletic Association*, No. 1:23-cv-100-JPB (the "West Virginia Action"), challenging and seeking to invalidate the NCAA Transfer Eligibility Rule's requirement that 4-4-4 transfer athletes sit out of athletic competition for an entire season before being eligible to play.

19.     On December 13, 2023, Judge Bailey issued a temporary restraining order (the "TRO") in the West Virginia Action enjoining the NCAA for a period of 14 days from enforcing the Transfer Eligibility Rule "insofar as it requires a transferor to sit out for an academic year of residence."  (Ex. A at 30.)

20.     Then, by Order dated December 18, 2023, Judge Bailey granted the parties' joint motion to convert the TRO into a preliminary injunction—the West Virginia Injunction—"that shall remain in effect until a full and final trial and decision on the merits" and mandating that "[t]he NCAA shall take no action to retaliate against any athlete that participates in athletic competition during the period of this Preliminary Injunction, or the member institution that such

5

athlete attends, based on the athlete's reliance upon the terms of this Preliminary Injunction."
(Ex. B at 2-3.)

21.     On the same day the court converted the TRO to a preliminary injunction
(December 18, 2023), the NCAA issued guidance "to assist the NCAA membership in
understanding implementation issues associated with the [preliminary injunction]." (Ex. C at 1.)
The NCAA acknowledged the effect of the West Virginia Injunction, stating that it is enjoined
from enforcing the Transfer Eligibility Rule "as it relates to the athletic participation of a student-
athlete resulting from the injunction." *Id.*

22.     In enjoining enforcement of the Transfer Eligibility Rule, Judge Bailey found that
it "hamstrings student-athletes by limiting the choices they have within the relevant market to find
a Division I institution that provides the best environment for their academic, mental, and
economic well-being." (Ex. A at 11.) Those restrictions, the court noted, "are not placed on
students who do not participate in college athletics, are not placed on coaches who leave one
NCAA member institution for another, nor placed on incoming freshman student-athletes who will
have a more significant adjustment period coming from high school." (*Id.* at 11.)

23.     Thus, Judge Bailey reasoned, "[t]he Transfer Eligibility Rule harms student-
athletes in three (3) main areas of the relevant markets: (1) when student-athletes are making the
decision on whether to transfer, (2) when college athletes decide to transfer and are searching for
a new institution to attend; and (3) when college athletes are denied eligibility to compete for one
year after transferring to a new institution." (*Id.*)

24.     Judge Bailey commented that "[n]ot only does the Transfer Eligibility Rule harm
the student-athletes economically, but the Transfer Eligibility Rule impacts the student-athletes'

overall mental well-being" and gave three examples of student-athletes whose mental health was "negatively affected" by the Transfer Eligibility Rule.  (*Id.* at 14.)

### C.  The NCAA's Rule Of Restitution.

25.    Section 12.11.4.2 of the NCAA Bylaws—commonly known as the "Rule of Restitution"—provides as follows:

> 12.11.4.2 Restitution.  If a student-athlete who is ineligible under the terms of the bylaws or other legislation of the Association is permitted to participate in intercollegiate competition contrary to such NCAA legislation but ***in accordance with the terms of a court restraining order or injunction*** operative against the institution attended by such student-athlete or against the Association, or both, and ***said injunction is voluntarily vacated, stayed or reversed or it is finally determined by the courts that injunctive relief is not or was not justified***, the Board of Directors may take any one or more of the following actions against such institution in the interest of restitution and fairness to competing institutions:
>
> (a)  Require that individual records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;
>
> (b)  Require that team records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;
>
> (c)  Require that team victories achieved during participation by such ineligible student-athlete shall be abrogated and the games or events forfeited to the opposing institutions;
>
> (d)  Require that individual awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;
>
> (e)  Require that team awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;
>
> (f)  Determine that the institution is ineligible for one or more NCAA championships in the sports and in the seasons in which such ineligible student-athlete participated;
>
> (g)  Determine that the institution is ineligible for invitational and postseason meets and tournaments in the sports and in the seasons in which such ineligible student-athlete participated;

(h) Require that the institution shall remit to the NCAA the institution's share of television receipts (other than the portion shared with other conference members) for appearing on any live television series or program if such ineligible student-athlete participates in a contest selected for such telecast, or if the Board of Directors concludes that the institution would not have been selected for such telecast but for the participation of such ineligible student-athlete during the season of the telecast; any such funds thus remitted shall be devoted to the NCAA postgraduate scholarship program; and

(i) Require that the institution that has been represented in an NCAA championship by such a student-athlete shall be assessed a financial penalty as determined by the Committee on Infractions.

*See* https://web3.ncaa.org/lsdbi/search/bylawView?id=681 (emphasis added).

26.     The Rule of Restitution allows the NCAA to punish a student-athlete and the member school he or she attends (as well as the student-athlete's teammates) if the student-athlete and the school rely on a court-issued TRO or preliminary injunction enjoining unlawful conduct by the NCAA and mandating that the student-athlete be permitted to participate in athletic competition if the TRO or injunction is later revoked for any reason.

27.     The clear purpose and effect of the Rule of Restitution is to discourage challenges to the NCAA's anticompetitive and improper rules and rulings by making it impossible for student-athletes and member schools to rely on validly entered court orders and to obtain meaningful injunctive relief.  Indeed, in light of the Rule of Restitution, colleges and universities typically do not permit a student-athlete to participate in athletic competition even if he or she obtains a TRO or preliminary injunction finding that an NCAA ruling is likely invalid and enjoining the NCAA from enforcing that unlawful restraint.

28.     As a result, in the West Virginia Action, the State AGs also sought a TRO and preliminary injunction prohibiting the NCAA from enforcing the Rule of Restitution against any

student-athletes and member schools who rely on the TRO and preliminary injunction enjoining enforcement of the Transfer Eligibility Rule.

29.     In his December 13 Order, Judge Bailey granted that relief, finding that his injunction against enforcement of the Transfer Eligibility Rule will only be effective if the NCAA is also enjoined from enforcing the Rule of Restitution.  (Ex. A at 27.)  In so ruling, Judge Bailey held that the Rule of Restitution "is in fact a measure designed to inhibit a person's access to the court" and is intended "to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor." (*Id.* at 29-30.)

30.     For the preliminary injunctive relief requested by Williams to be effective, this Court must enjoin the NCAA from enforcing the Rule of Restitution for complying with an order granting that relief.

### D.  The NCAA's Penalty Concerning William's Gambling

31.     As a result of the TRO/preliminary injunction entered by Judge Bailey in the West Virginia Action, all 4-4-4 transfer athletes who had been sitting out of athletic competition because of the Transfer Eligibility Rule were permitted as of December 13, 2023, the date the TRO was entered, to begin participating in games.

32.     The NCAA case representatives assigned Williams's case repeatedly advised Rutgers and Williams earlier in the season that, as a result of Williams's admitted sports wagering, it would impose on him a suspension of 50% of one basketball season, which translates to 15 games.  Knowing that a suspension would be imposed upon him, Williams did not participate in any of the first twenty games played by the Rutgers Men's University Basketball Team.

33.     Rutgers played nine games before the West Virginia Injunction was entered; Williams sat out those nine games based on his sports-wagering suspension.  As of

February 1, 2024, Rutgers had played an additional eleven games since the West Virginia Injunction was entered on December 13, 2023.  Williams also sat out those eleven games, the first six of them in fulfillment of his sports-wagering suspension and the last five waiting for the NCAA to formally reinstate him.  Because he has now sat out twenty games in total this season, Williams has served significantly more than the full 15-game suspension the NCAA had indicated it would impose on him for sports wagering.  Yet the NCAA has not reinstated him.  Last night, January 31, 2024, the NCAA issued its formal decision suspending Williams for 50% of the 2023-24 men's basketball season.

34.     Williams knew that he would be ineligible to play in 50% of the 2023-24 college-basketball season based on his sports-wagering violation, and sat out the first half of the season on that basis.

35.     Months before the season began, there were several well-publicized challenges to the Transfer Eligibility Rule.  For example, Devontez Walker—a North Carolina wide receiver and 4-4-4 transfer—successfully challenged the NCAA's initial denial of his eligibility request.  *See* https://www.espn.com/college-football/story/_/id/38575487/tez-walker-allowed-play-2023-ncaa-reverses-decision-wr.  On September 26, 2023, the North Carolina Attorney General (later a plaintiff in the West Virginia Action) wrote the NCAA in support of Walker's eligibility request, arguing that the NCAA's transfer rules "seem likely to violate antitrust laws" and advising that the AG's office was "considering the full range of options at its disposal to investigate the NCAA's potential antitrust violations."  (Ex. D.)

36.     Because Williams has now served more than his full sports-wagering suspension of 15 games and, as many anticipated, the Transfer Eligibility Rule has been enjoined, he has been

eligible to play since no later than January 14, 2024, when Rutgers played its sixteenth game against Michigan State University.

37.    Williams, however, has yet to appear in a Rutgers game because the NCAA did not formally issue its sports-wagering suspension until last night, and has advised him and Rutgers that it does not regard the nine games he sat out prior to entry of the West Virginia Injunction as having been served in fulfillment of that suspension.  Thus, according to the NCAA's reasoning, Williams has served only eleven games of his suspension and will not be eligible to play until Rutgers's game against the University of Minnesota on February 18, 2024.

38.    The NCAA's refusal to credit Williams for sitting out the nine games Rutgers played prior to December 13, 2023, and permit him to begin playing on Saturday because the Transfer Eligibility Rule was in effect during those nine games violates the West Virginia Injunction.

39.    The NCAA's insistence upon enforcing the Transfer Eligibility Rule enjoined by the West Virginia Injunction is a continuation and extension of the precise anticompetitive conduct that injunction was designed to enjoin.

40.    Because of the commercial nature of the transactions between student-athletes and their NCAA member institutions and the effect these transactions have on college athletes and the consumers of college athletics, the NCAA's unreasonable interpretation of its authority to deny student-athletes the ability to compete despite the clear import of the West Virginia Injunction violates the Sherman Act.

41.    The NCAA's anticompetitive conduct affects the sports-specific markets for the labor of NCAA Division I student-athletes in a way that far outweighs any pretextual procompetitive benefits of that conduct.  Further, the NCAA's position that it can refuse to credit

Williams for games he sat out before entry of the West Virginia Injunction is an unreasonable restraint of trade that cannot survive the rule-of-reason analysis.

### E.  Williams's Efforts To Resolve This Dispute

42.     On January 28, 2024, Williams's counsel, Kevin H. Marino ("Marino"), emailed Scott Bearby, Senior Vice President of Legal Affairs and General Counsel for the NCAA, and Michele R. Forte-Osborne ("Forte-Osborne"), Managing Director of Legal Affairs and Senior Counsel for the NCAA, to (a) advise them that, if necessary, Williams would file this lawsuit against the NCAA seeking to enjoin it from preventing him from playing basketball for the Rutgers University Men's Basketball Team even though he is eligible to do so; and (b) requested a telephone conference to discuss the issue in an effort to resolve the dispute and avoid litigation. (Ex. E.)

43.     On January 29, 2024, Marino spoke to Forte-Osborne by telephone.  When Marino explained that Williams had, by that date, sat out nineteen games and thus had already served his entire sports-wagering suspension, Forte-Osborne responded that Williams's case had not yet been formally adjudicated, he had not yet been suspended, and—despite the NCAA's representations to Rutgers officials that Williams's suspension would be 50% of a season—the length of his suspension was not yet known.

44.     During the January 29 telephone call, Marino also explained to Forte-Osborne that the NCAA's refusal to credit the nine games Rutgers played before entry of the TRO in the West Virginia Action is unreasonable because a federal judge has declared the Transfer Eligibility Rule to be unlawful and invalid.  Forte-Osborne responded that the Transfer Eligibility Rule has not been invalidated; the NCAA has merely been enjoined from enforcing it.

45.     That January 29 telephone call made clear not just that the NCAA has no interest in resolving this dispute and reinstating Williams's eligibility, but also that it has no legal basis for its position and no respect for the West Virginia Injunction entered against it by Judge Bailey.

46.     After speaking with Forte-Osborne on January 29, 2024, Marino sent her an email the same day (copied to Greg Pottorff and Kimberly Fort of the NCAA) stating the following:

> Regardless of whether the NCAA has formally advised Mr. Williams that his penalty for sports wagering will not exceed 60% of the games Rutgers will play this season, and despite our divergent views as to the significance of the court order enjoining the NCAA from enforcing the Transfer Eligibility Rule, two facts are beyond dispute: Mr. Williams has already served the maximum penalty the NCAA will impose upon him for his sports-wagering offense by sitting out 19 games this season, and the NCAA cannot enforce its Transfer Eligibility Rule to prevent Mr. Williams from beginning to play immediately for the Rutgers University Men's Basketball Team, or penalize him or Rutgers under the NCAA Rule of Restitution for relying on the preliminary injunction entered against the NCAA in the United States District Court for the Northern District of West Virginia.  Accordingly, Mr. Williams respectfully requests that you acknowledge, by return email, that he has served his sports-wagering suspension and that he will not be further penalized for playing immediately for the Rutgers University Men's Basketball [Team] and that Rutgers University will not be penalized for permitting him to do so.

(Ex. F.)

47.     Forte-Osborne responded by email the next morning, stating that ***"Williams is currently ineligible due to a violation of the NCAA's sports wagering rules"*** and "will be ineligible for further intercollegiate competition, subject to appeal to the Committee on Student-Athlete Reinstatement for restoration of his eligibility."  (Ex. F (emphasis added).)  Forte-Osborne further stated that "Rutgers University is currently working through the reinstatement process on behalf of Mr. Williams" and "will receive notice when a reinstatement decision has been rendered," at which time "Rutgers University may accept the decision or file an appeal within 30 calendar days."  (*Id.*)

48.     Thus, the NCAA improperly lengthened Williams's sports-wagering suspension by refusing to formally issue it yet taking the position that he is ineligible based on it.  By that logic, the NCAA could have waited until after the 2023-24 season to issue Williams's formal suspension, in which event he would have missed all 31 regular season games and any post-season tournament in which Rutgers participates—well more than the 15-game suspension the NCAA imposed on him last evening for his sports-wagering violation.  Indeed, because the NCAA waited until January 31, 2024, to formally issue Williams's 15-game suspension, he has been forced to sit out twenty games in total—five more than his suspension.

49.     Despite Forte-Osborne's statement that Williams's ineligibility was based on his sports-wagering violation, the NCAA's refusal to reinstate him despite his having served the 15-game suspension imposed on him for that violation makes clear that the NCAA is in fact denying him eligibility based on its repudiated Transfer Eligibility Rule, in direct violation of the West Virginia Injunction.

**F.  Relevant Markets**

50.     There are two broad categories of labor markets affected by the NCAA's decision to deny Williams and similarly situated student-athletes immediate reinstatement: (1) athletic services in men's and women's Division I basketball, in which each student-athlete participates in his or her sport-specific market; and (2) athletic services in all other men's and women's Division I sports, in which each athlete participates in his or her sport-specific market.  College athletes compete to earn spots on NCAA Division I athletic teams and NCAA member institutions compete to attract and secure top-level college athletes.  The NCAA member institutions secure college-athletes through the provision of various in-kind benefits, including full and partial scholarships, advanced academic programing, access to state-of-the-art training and rehabilitation facilities, and premier instruction from knowledgeable coaching staffs.

51.     The United States is the relevant geographic market, and the NCAA and its member institutions are located in that geographic market.

52.     Participating in NCAA Division I athletics provides significant benefits and opportunities to college athletes, including: (1) the ability to maximize their chances to play professional sports by providing extensive exposure to scouts; (2) the opportunity to compete against the nation's best amateur athletes; (3) national publicity through nationwide broadcasting of sporting events; (4) full and partial scholarships; (5) the opportunity to earn personal sponsorship opportunities and marketing deals; (6) the ability to capitalize on Name, Image and Likeness ("NIL") agreements, which sometimes provide millions of dollars in financial benefits; and (7) receipt of top-tier academic support through student-athlete assistance programs. (Ex. A)

53.     The most talented student-athletes have no practical alternatives in the relevant markets to participating in NCAA Division I athletics.

54.     The NCAA has sole rule-making authority and maintains exclusive power over the promulgation of rules and regulations for member institutions.

55.     Though the NCAA is a non-profit organization, members reap significant financial gains through the transactions that they make with student-athletes.  Member institutions reap hosting revenue for athletic events on their campuses, merchandise sales, television broadcasting contracts, and the generation of interest for the institution.  In return, the student-athletes receive the many benefits enumerated above.

56.      Accordingly, the transactions between member institutions and student-athletes are inherently commercial in nature and fall under the purview of the Sherman Act.

**G. Anti-competitive Effects**

57.     The NCAA enacts and enforces rules that it claims promote fairness and the well-being of student-athletes while preserving true athletic amateurism.  These rules are adopted

through the NCAA Division I Council and member institutions, effectively making the rules the practical equivalent of horizontal agreements among the NCAA and the member institutions who compete against one another for the labor of student-athletes.

58.     The NCAA's refusal to credit against Williams's sports-wagering suspension the nine Rutgers games played before entry of the West Virginia Injunction, beyond being contrary to law, is wholly unfair to him, his teammates and Rutgers.  It also sets a dangerous precedent that the NCAA can use rules and regulations that have been invalidated by a United States District Court to deny student-athletes eligibility and thereby harm them and the member schools they attend.  The NCAA's conduct violates the Sherman Act because it has direct anticompetitive effects that harm college athletes and consumers of college athletics. That is why the West Virginia Injunction was entered.  The NCAA must now be told that it must follow the law by abiding that injunction.

59.     Allowing the NCAA to refuse to credit the nine games Rutgers played before entry of the West Virginia Injunction against Williams's sports-wagering suspension, beyond sanctioning a flagrant violation of a federal court order, would cause significant anticompetitive harm to Williams and similarly situated student-athletes participating in the labor market.  Under the NCAA's arbitrary interpretation of its rules, student-athletes who have been sidelined by both the now-invalid Transfer Eligibility Rule and suspensions imposed for some other reason will remain ineligible to participate in NCAA competition even though those student-athletes have served their suspensions.  Unless enjoined in the manner requested in this action, the NCAA will be able to use Williams's case as precedent to deny future student-athletes suspension credit for games they missed because of other NCAA rules and regulations that are subsequently deemed invalid.

60.     Further, consumers who attend NCAA athletic events or watch them on television or streaming services will also be negatively affected by the NCAA's arbitrary and unreasonable conduct.  It is reasonable to expect that fan interest in college athletics will dissipate if the governing body tasked with regulating and ensuring fair competition fails to do so.  The most talented prospective student-athletes may be deterred from attending Division I schools if they believe the NCAA does not promote fair competition and does not treat athletes fairly, especially with the growing availability of other professional sports opportunities in the United States and elsewhere.

### H.  The Irreparable Harm To Williams

61.     There is no doubt that Williams will suffer substantial irreparable harm if the Court does not grant the TRO and preliminary injunction requested in this action, which will enable him to immediately join his Rutgers teammates and continue his promising basketball career.

62.     Even if the Court grants Williams the relief he seeks at a later date, he will never be able to play in the games that have already occurred.  He will thus be denied the opportunity those games present to gain the attention, notoriety, and acclaim that can accompany playing for a Division I men's basketball team, to take advantage of the potential NIL deals now available to elite student-athletes, and to perhaps earn a contract to play professional basketball here or abroad upon graduation.

63.     That is the very definition of irreparable harm, as Judge Bailey so aptly explained in enjoining enforcement of the Transfer Eligibility Rule:

> It takes one throw, one catch, one shot, one block to make a student-athlete a household name across the nation.  Student-athletes are harmed by the Transfer Eligibility Rule and are not able to show the world the fruits of their labor in instances where they are forced to sit out a year of eligibility.  In turn, this inhibits their ability to take advantage of NIL deals and positions, and limits potential earning based on professional league drafts.

(Ex. A at 14.)

64.     Despite the obvious threat that Williams will suffer irreparable harm if not reinstated immediately, the NCAA has reacted with callous disregard for his plight, taking the position that he is still ineligible to play because of the legally invalid Transfer Eligibility Rule. This Court's intervention is needed to right this wrong.

## COUNT ONE
### (Violation of § 1 of the Sherman Act)

65.     Williams repeats and realleges the allegations contained in Paragraphs 1 through 64 of this Complaint as though fully set forth herein.

66.     The NCAA, by and through its officers, directors, employees, agents or other representatives, has illegally restrained and suppressed competition in the relevant markets through its refusal to credit against Williams's sports-wagering suspension the nine games that Rutgers played prior to entry of the TRO in the West Virginia Action on December 13, 2023.  The NCAA's illogical and self-serving view of its right to sideline student-athletes who have served their suspensions impedes fair competition.   The threat posed by the NCAA having license to bar student-athletes from realizing the opportunities they have earned without logical justification stifles the market's ability to flourish.

67.     As a direct result of the NCAA's denial of Williams's reinstatement, the NCAA will establish a precedent that it may unreasonably restrict student-athletes' ability to participate in the relevant labor market.

68.     The NCAA's position results in no benefits to competition in Division I collegiate athletics for the NCAA's member institutions, college athletes, or consumers of NCAA athletic contests.

69.     Defendant's anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce.

## COUNT TWO
### (Breach of Contract)

70.     Williams repeats and realleges the allegations contained in Paragraphs 1 through 69 of this Complaint as though fully set forth herein.

71.     Rutgers is a member of the NCAA Division I.  As such, Rutgers has agreed to submit to and abide by the NCAA's rules and regulations in exchange for the benefits of NCAA membership, such as participation in high-level intercollegiate athletic competitions.  Furthermore, Rutgers has agreed to subject itself to NCAA discipline for any failure to comply with its rules and regulations.

72.     Williams, as a student-athlete enrolled at Rutgers who is subject to the same NCAA rules and regulations, is an intended third-party beneficiary of the contractual relationship between Rutgers and the NCAA.

73.     The NCAA has a contractual obligation to Williams, as an intended third-party beneficiary, to enforce its rule and regulations fairly, consistently and reasonably.

74.     As detailed above, the NCAA refuses to deem Williams eligible for immediate participation in athletic competition based on its unreasonable and arbitrary refusal to credit him for the nine games he sat out before Judge Bailey declared the Transfer Eligibility Rule unlawful and invalid because, in its view, he was sitting out pursuant to that invalid Rule, not because of his sports-gaming suspension.

75.     The NCAA is acting as though its Transfer-Eligibility rule was valid prior to the entry of that injunction, and it was not.  All players who are affected by the Transfer-Eligibility Rule can and doubtless will seek damages for the harm they have suffered from enforcement of

that rule. It is a fiction for the NCAA to say that the rule was valid prior to the injunction when, in reality, the Court's decision makes clear it was not and, therefore, gives student-athletes an ability to seek damages. The NCAA's refusal to credit Williams with having fully served his suspension and to immediately reinstate him is directly contrary to its promise to enforce and adjudicate its rules fairly.

76. Accordingly, by refusing to give Williams credit for the nine games played by Rutgers before entry of Judge Bailey's TRO on December 13, 2023 and to immediately reinstate Williams's eligibility, the NCAA has breached its contractual obligations to him because there is no NCAA rule or regulation in existence that authorizes or permits those actions.

77. As an intended third-party beneficiary of Rutgers's agreement to be bound by the NCAA rules and regulations, Plaintiff has suffered and continues to suffer substantial and irreparable harm as a result the NCAA's denial of his eligibility to participate in athletics without any valid contractual authority. To unjustly sideline Williams for additional games deprives him of the once-in-a-lifetime opportunity to compete in Division I basketball games, improve his game, support his teammates, and showcase his talents to future professional employers. Specifically, Plaintiff is unable to compete in athletic competition and avail himself of the myriad opportunities that emanate from his participation, including lucrative NIL rights.

## COUNT THREE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

78. Williams repeats and realleges the allegations contained in Paragraphs 1 through 77 of this Complaint as though fully set forth herein.

79. There is a covenant of good faith and fair dealing implied in every contract, including the contract between the NCAA and Rutgers to which Williams is, as alleged above, an intended third-party beneficiary. That covenant imposes on the parties an obligation to treat one

another reasonably and fairly, and to not do anything to destroy or injure one another's right to receive the fruits of the contract.

80.     As detailed above, the NCAA has treated Williams unreasonably and unfairly, and has destroyed and injured his contractual rights, by refusing to credit against his sports-wagering suspension the nine games Rutgers played before entry of Judge Bailey's TRO on December 13, 2023.  The NCAA has engaged in this conduct for the improper purpose and ill motive of enforcing its invalid Transfer Eligibility Rule in direct violation of a federal court order.

81.     The NCAA has, therefore, breached the implied covenant of good faith and fair dealing.

82.     As a direct and proximate result of the NCAA's breach of the implied covenant of good faith and fair dealing, Williams has suffered and will continue to suffer significant damages, as alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Williams respectfully requests Judgment in his favor and against the NCAA as follows:

A.     Declaring that the nine Rutgers University basketball games Williams sat out prior to entry of the TRO in the West Virginia Action were in fulfillment of his sports-wagering suspension and that his suspension has now been fully served;

B.     Preliminarily and permanently enjoining the NCAA to immediately reinstate Williams's eligibility to participate in athletic competition;

C.     Preliminarily and permanently enjoining the NCAA from enforcing the Rule of Restitution against Williams for complying with and/or relying on the West Virginia Injunction and any TRO or injunctive orders entered by this Court;

D.   Awarding Williams compensatory and punitive damages, attorneys' fees and costs, prejudgment and post-judgment interest, and such other and further relief as the Court may deem equitable and just.

Dated: February 1, 2024                    MARINO, TORTORELLA & BOYLE, P.C.
        Chatham, New Jersey

By: _____
    Kevin H. Marino
    John A. Boyle
    John D. Tortorella
    Anthony J. Tagliaferro
    437 Southern Boulevard
    Chatham, New Jersey 07928-1488
    (973) 824-9300
    *Attorneys for Plaintiff*
    *Jeremiah Williams*

## **JURY DEMAND**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff, Jeremiah Williams, hereby demands a trial by jury on all issues properly so triable.

Dated: February 1, 2024         MARINO, TORTORELLA & BOYLE, P.C.
       Chatham, New Jersey

By: _____
    Kevin H. Marino
    John A. Boyle
    John D. Tortorella
    Anthony J. Tagliaferro
    437 Southern Boulevard
    Chatham, New Jersey 07928-1488
    (973) 824-9300
    *Attorneys for Plaintiff*
    *Jeremiah Williams*

## **VERIFICATION**

I, Jeremiah Williams, verify based on my personal knowledge that the facts set forth in the attached Verified Complaint are true and correct to the best of my knowledge, information, and belief.

I verify under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct.

Executed on February 1, 2024

_____
JEREMIAH WILLIAMS

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Clarksburg**

**STATE OF OHIO,
STATE OF COLORADO,
STATE OF ILLINOIS,
STATE OF NEW YORK,
STATE OF NORTH CAROLINA,
STATE OF TENNESSEE,** and
**STATE OF WEST VIRGINIA,**

              Plaintiffs,

       v.                              **CIVIL ACTION NO. 1:23-CV-100**
                                              Judge Bailey

**NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,**

              Defendant.

**<u>ORDER</u>**

Pending before this Court is Plaintiff States[1] Motion for a Temporary Restraining

Order and Preliminary Injunction [Doc. 2], filed December 7, 2023.  This Court held a

hearing on the Motion for a Temporary Restraining Order on December 13, 2023.

**I.**    **Background**

As stated in the National Collegiate Athletic Association's Preamble:

The National Collegiate Athletic Association is a voluntary, self-governing

organization of four-year colleges, universities and conferences committed

---

[1] Plaintiff States consist of the States of Ohio, Colorado, Illinois, New York, North
Carolina, Tennessee, and West Virginia.

to the well-being and development of student-athletes, to sound academic standards and the academic success of student-athletes, and to diversity, equity and inclusion. Member institutions and conferences believe that intercollegiate athletics programs provide student-athletes with the opportunity to participate in sports and compete as a vital, co-curricular part of their educational experience. The member schools and conferences likewise are committed to integrity and sportsmanship in their athletics programs and to institutional control of and responsibility for those programs. The basic purpose of the Association is to support and promote healthy and safe intercollegiate athletics, including national championships, as an integral part of the education program and the student-athlete as an integral part of the student body.

[Doc. 2-2 at 14]. The Northern District of California provided a history of the NCAA in *In re National Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litigation*,:

The NCAA, then known as the Intercollegiate Athletic Association (IAA), was founded in 1905 to regulate college football. Today, the NCAA and its members collectively issue rules that govern many aspects of athletic competitions among NCAA member schools. Joint Stipulation of Facts (Stip. Facts) ¶ 1, Docket No. 1098.

The NCAA comprises three Divisions. Id. ¶ 2. Of the NCAA's eleven hundred schools, approximately three hundred and fifty schools compete in Division I. Id. ¶ 5. Division I itself is divided, for the purposes of football competition, into two subdivisions, one of which is the FBS. Id. ¶ 6. There are

2

thirty-two conferences in Division I. Id. ¶ 7. Conferences may enact and enforce conference-specific rules, but these must be consistent with the NCAA's own rules. Id.

The NCAA rules governing participation in Division I generally are enacted by the Division I Board of Directors. Id. ¶¶ 11, 12. The rules that Plaintiffs challenge here govern a small subset of the conduct that the NCAA regulates.

The NCAA generates approximately one billion dollars in revenues each year. See Defs.' Ex. 0532 (D0532); Pls.' Ex. 0030 (P0030). Its revenues have increased consistently over the years. See P0030. Most of the NCAA's revenues are derived from the Division I men's basketball post-season tournament known as March Madness, and the media and marketing rights relating to it. Trial Transcript (Tr.) (McNeely) at 2134; D0532 at 0006. The total value of the current multi-year media contracts for March Madness, which extend to 2032, is $ 19.6 billion. See P0045 at 0001-02. Each year, the NCAA distributes about half of its revenues to the conferences. Joint Ex. 0021 (J0021); P0030.

Division I conferences negotiate their own contracts and generate their own revenues from regular-season basketball and regular-and post-season FBS football. See, e.g., Dr. Daniel Rascher Direct Testimony Declaration ¶¶ 169-172, Docket No. 865-3. The FBS conferences have a multi-year media contract with ESPN for the College Football Playoff, the total value of which is $ 5.64 billion. See P0045 at 0006-07. The five

3

conferences with the largest revenues, known as the Power Five Conferences, each generate hundreds of millions of dollars in revenues per year, in addition to the money that the NCAA distributes to them. See P0031; P0032; P0033; P0036; see also P0037 (showing that SEC made more than $ 409 million in revenues from television contracts alone in 2017, with its total conference revenues exceeding $ 650 million that year). The revenues of the Power Five have increased over time and are projected to continue to increase. See P0031; P0032; P0033; P0036; P0037. Conferences distribute most of their revenues to their member schools.

375 F.Supp.3d 1058, 1062–1063 (N.D. Cal. 2019).

In the Motion, Plaintiff States move this Court for a Temporary Restraining Order and Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65 enjoining the National Collegiate Athletic Association (hereinafter "NCAA") from enforcing NCAA Bylaw 14.5.5.1 ("Transfer Eligibility Rule").  In support, Plaintiff States assert "Division I college athletes subject to the Transfer Eligibility Rule will suffer immediate and irreparable harm by continuing to be barred from competing this season in their respective collegiate sports and by facing transfer decisions burdened by the risks of ineligibility that the Rule imposes on second-time transferring college athletes."  [Doc. 2 at 1].  Moreover, Plaintiff States assert that "for temporary and preliminary injunctive relief against the Transfer Eligibility Rule to be effective, the Court must also enjoin [the NCAA] from enforcing Bylaw 12.11.4.2 . . . [which] allows [the NCAA] to punish its member institutions when a college athlete who is ineligible for competition participates in games under a court order allowing

4

the college athlete's participation if the court order is later vacated, reversed, or otherwise invalidated." [Id.].

## II.   Legal Standard

Before issuing a temporary restraining order, this Court must consider (1) the movant's likelihood of success on the merits, (2) the likelihood of irreparable harm absent injunctive relief, (3) the balance of hardships, and (4) the public interest. ***Winter v. Nat. Res. Def. Council, Inc.***, 555 U.S. 7, 20 (2008).

Federal Rule of Civil Procedure 65 provides

Every order granting an injunction and every restraining order must:

(A) state the reasons why it issued;

(B) state its term specifically; and

(C) describe in reasonable detail--and not by referring to the complaint or other document--the act or acts restrained or required.

## III.   Analysis

At the heart of this case is NCAA Bylaw 14.5.5.1, commonly known as the "Transfer Eligibility Rule," which provides:

14.5.5.1 General Rule. A transfer student from a four-year institution shall not be eligible for intercollegiate competition until the student has fulfilled an academic year of residence (see Bylaw 14.02.10) at the certifying institution unless the student qualifies for one of the transfer exceptions set forth in Bylaws 14.5.5.1.1, 14.5.5.1.2 or 14.5.5.1.3. A transfer student (other than one under disciplinary suspension per Bylaw 14.5.1.2) may qualify for an

exception to the academic year of residence requirement provided they do

not have an unfulfilled residence requirement at the institution from which

they are transferring. (See Bylaw 14.1.11, for student-athletes participating

in a recognized foreign exchange/study abroad program).

[Doc. 2-2 at 178].

Balancing the four factors in issuing an injunction, Plaintiff States can meet the

requirements for a temporary restraining order against the NCAA's enforcement of the

Transfer Eligibility Rule and the Rule of Restitution.

**A.      Plaintiff States have a likelihood of success on the merits of the Sherman Act Section 1 claim.**

While a plaintiff is required to make a clear showing that he is likely to succeed on

the merits in order to obtain injunctive relief, a plaintiff is not required to establish with

certainty that he will succeed on the merits. *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir.

2013); *Roe v. U.S.*, 947 U.S. 207, 219 (4th Cir. 2020). Indeed "[a] district court's

determination that such a showing [of likelihood of success on the merits] has been made

is best understood as a prediction of a probable, but necessarily uncertain, outcome...."

*Stinnie v. Holcomb*, 37 F.4th 977, 982 (4th Cir. 2022) (quoting *Smyth ex rel. Smyth v.

Rivero*, 282 F.3d 268, 276 (4th Cir. 2002)); *Stinnie v. Holcomb*, 77 F.4th 200, 208 (4th

Cir. 2023). Moreover, in showing a  likelihood of success on the merits, a plaintiff is not

required to demonstrate a likelihood of success on all claims.   *Power Balance LLC

v. Power Force LLC, No. SACV*, 2010 WL 5174957, at *5 (C.D. Cal. Dec. 14, 2010); *see

Hudson v. AFGE*, 292 F.Supp.3d 145, 153 (D. D.C. Nov. 9, 2017) (Boasberg, J.) ("the

Court begins with [movant's] likelihood of success on the merits of at least one claim"

6

[emphasis added]); *see also **Miller v. Garland***, 2023 WL 3692841, at *34 (E.D. Va. May 26, 2023) (Alston, Jr., J.); see also ***Winter***, 555 U.S. at 19 n.4 (Circuit Court's discussion limited to a single claim of Plaintiff's multi-claim complaint).

The above-styled action is an antitrust lawsuit challenging the NCAA's Transfer Eligibility Rule. Specifically, Plaintiff States allege that the NCAA's rules violate § 1 of the Sherman Act,[2] which prohibits "contract[s], combination[s], or conspirac[ies] in restraint of trade or commerce." 15 U.S.C. § 1. The Supreme Court of the United States

> has "long recognized that in view of the common law and the law in this country when the Sherman Act was passed, the 'restraint of trade' is best read to mean 'undue restraint.'" ***Ohio v. American Express Co.***, 138 S.Ct. 2274, 2283 (2018) (brackets and some internal quotation marks omitted). Determining whether a restraint is undue for purposes of the Sherman Act "presumptively" calls for what we have described as a "rule of reason analysis." ***Texaco Inc. v. Dagher***, 547 U.S. 1, 5 (2006); ***Standard Oil Co. of N. J. v. United States***, 221 U.S. 1, 60–62 (1911). That manner of analysis generally requires a court to "conduct a fact-specific assessment of market power and market structure" to assess a challenged restraint's "actual effect on competition." ***American Express***, 138 S.Ct. at 2284 (internal quotation marks omitted). Always, "[t]he goal is to distinguish between restraints with anticompetitive effect that are harmful to the

_____

[2] The Supreme Court of the United States "has already recognized that the NCAA itself *is* subject to the Sherman Act." ***National Collegiate Athletic Ass'n v. Alston***, 141 S.Ct. 2141, 2159 (2021).

> consumer and restraints stimulating competition that are in the consumer's
> best interest." *Ibid*. (brackets and internal quotation marks omitted).

*National Collegiate Athletic Ass'n v. Alston*, 141 S.Ct. 2141, 2151 (2021).

When analyzing a claim under Section 1 of the Sherman Act to determine whether a restraint violates the rule of reason, courts use a "three-step, burden shifting framework." *American Express*, 138 S.Ct. at 2284. Under this framework,

> the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market. . . .  If the plaintiff carries its burden, then the burden shifts to the defendant to show a procompetitive rationale for the restraint. . . . If the defendant makes this showing, then the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means.

*Id*. "[T]he amount of work needed to conduct a fair assessment of these questions can vary. . . . [T]his Court has suggested that sometimes we can determine the competitive effects of a challenged restraint in the "'twinkling of an eye.'" *Alston*, 141 S.Ct. at 2155 (citing *National Collegiate Athletic Ass'n v. Board of Regents of University of Oklahoma*, 465 U.S. 85, 110, n.39 (1984) (quoting P. Areeda, The "Rule of Reason" in Antitrust Analysis: General Issues 37–38 (Federal Judicial Center, June 1981))).

"At one end of the spectrum, some restraints may be so obviously incapable of harming competition that they require little scrutiny. . . . At the other end, some agreements among competitors so obviously threaten to reduce output and raise prices that they might

8

be condemned as unlawful *per se* or rejected after only a quick look." *Alston*, 141 S.Ct. at 2155–56.

As the *Alston* Court explained, the NCAA admits that it participates in "horizontal price fixing in a market where the defendants exercise monopoly control." *Id*. at 2154. Moreover, it was noted by the Supreme Court that, at least in that case, "[n]o one dispute[d] that the NCAA's restrictions in fact decrease the compensation that student-athletes receive compared to what a competitive market would yield. No one question[ed] either that decreases in compensation also depress participation by student-athletes in the relevant labor market—so that price and quantity are both suppressed." *Id*.

Here, these bylaws are essentially horizontal agreements among competitors that compete in the same sport-specific markets within NCAA Division I theatrics.  Once an institution lures an athlete to transfer to their school (often with the promise of NIL money), the institution does not want anyone else to take the student-athlete as a transfer.  The sole difference between this case and *Alston* is that *Alston* involved compensation provided to athletes while Plaintiff here challenges an even more direct restraint on trade: the NCAA's transfer rules which prohibit a student from playing immediately following their second transfer. Finally, the NCAA's stated preference of allowing transfers near a student's home but not far is essentially a geographic market-allocation that is also a antitrust violation. Plaintiff States have, therefore, a likelihood of success showing that the NCAA has committed a violation of the Sherman Antitrust Act.

i.      **The United States is the "relevant market."**

"Under the Sherman Act, a plaintiff making monopoly and attempted monopoly claims must allege a relevant geographic market to help the court determine whether the defendant has monopoly power." *E.I. du Pont de Nemours and Co. v. Kolon Industries, Inc.*, 637 F.3d 435, 439 (4th Cir. 2011)

The Supreme Court of the United States in *Alston* explained that "[t]he NCAA *accepts* that its members collectively enjoy monopsony power in the market for student-athlete services, such that its restraints can (and in fact do) harm competition. . . . Unlike customers who would look elsewhere when a small van company raises its prices above market levels, the district court found (and the NCAA does not here contest) that student-athletes have nowhere else to sell their labor." 141 S.Ct. at 2156.

Within NCAA Division 1 athletics, the Transfer Eligibility Rule affects two (2) broad categories of labor markets: (1) athletic services in men's and women's Division 1 basketball and football bowl subdivision ("FBS"), wherein each college athlete participates in his or her sport-specific market, and (2) athletic services in all other men's and women's Division I sports, wherein each athlete participates in his or her sport-specific market.

The NCAA and its member institutions maintain exclusive market power, with the sole ability to dictate rules and regulations for participation in Division I athletics. Thus, these labor markets within NCAA Division I college athletics in the United States are relevant antitrust markets.

ii.     **The Transfer Eligibility Rule harms college athletes in the relevant markets.**

The Transfer Eligibility Rule hamstrings student-athletes by limiting the choices they have within the relevant market to find a Division I institution that provides the best environment for their academic, mental, and economic well-being. These same restrictions are not placed on students who do not participate in college athletics, are not placed on coaches who leave one NCAA member institution for another, nor placed on incoming freshman student-athletes who will have a more significant adjustment period coming from high school. The Transfer Eligibility Rule harms student-athletes in three (3) main areas of the relevant markets: (1) when student-athletes are making the decision on whether to transfer, (2) when college athletes decide to transfer and are searching for a new institution to attend; and (3) when college athletes are denied eligibility to compete for one year after transferring to a new institution.[3]

First, the Transfer Eligibility Rule harms student-athletes by penalizing transfer student-athletes with an entire academic year of ineligibility. With the potential of a year of ineligibility looming over transfer decisions, student-athletes may hesitate to transfer even when a different institution may offer a situation that is better for the student-athlete. Student-athletes cannot apply for a waiver of the Transfer Eligibility Rule until enrolled at a new member institution. For example: take Noah Fenske. Noah Fenske started his collegiate career at the University of Iowa on a football scholarship. Noah Fenske left Iowa

___

[3] These considerations are magnified given that student-athletes have five (5) calendar years to complete their four (4) seasons of eligibility in any one sport pursuant to NCAA Bylaw Rule 12.8.1.

11

due to mental health concerns and transferred to the University of Colorado ("Colorado"). While at Colorado, he dealt with mental health issues and sought counseling. The environment at Colorado was difficult and the school transitioned through more than one coaching staff while he was on the team. The new coach at Colorado made it clear that current players were not going to be welcomed back after spring practices, which left Noah Fenske with no choice but to look to transfer again in order to keep his scholarship. Noah Fenske, under the assumption he would immediately be eligible, transferred to Southern Illinois University ("SIU"). After arriving to SIU, Noah Fenske was made aware that a waiver would have to be filed with the NCAA for immediate eligibility. Noah Fenske had many coaches tell him he was good enough to enter the draft after the season, but because Noah Fenske did not get to compete, no one had the opportunity to assess his talent. In total, he missed 11 regular season and two FCS Playoff games during the Fall 2023 season. The Transfer Eligibility ruled harmed Noah Fenske's ability to play football, earn NIL[4] money, his mental health, and the possibility to play professional football.

Second, the Transfer Eligibility Rule restricts the options of affected college athletes by limiting their choices of new institutions after making the decision to transfer. Student-athletes who are not excepted from the Transfer Eligibility Rule face a competitive disadvantage in the relevant markets. The NCAA member institutions compete all year long for the best college athletes for their athletic teams. The Transfer Eligibility Rule has institutions facing the risk that a transferring student-athlete may not be eligible to play for an entire academic year. Institutions may be less likely to offer a scholarship position to

---

[4] NIL means a player's name, image and likeness, which allows student-athletes to make money from their personal brand.

student-athletes who are subject to the Transfer Eligibility Rule and who may not be eligible for an entire academic year.  For example: RaeQuan Battle.  RaeQuan Battle started his basketball career at the University of Washington.  Thereafter, he transferred to Montana State University ("MSU").  RaeQuan Battle lost his coach at MSU, a situation over which he had no control, which prompted his decision to transfer to West Virginia University ("WVU").  WVU took a chance on RaeQuan Battle, who faced a disadvantage by being restricted by the Transfer Eligibility Rule.  WVU applied for him to receive a waiver for immediate eligibility, as he and WVU believed that his circumstances fit within the NCAA's criteria for waiver requests.  The NCAA denied his appeal for immediate eligibility.  By RaeQuan Battle not being able to participate in competitive games, it significantly impacts his ability to pursue NIL compensation and his chances to pursue a career in professional basketball.

Third, the Transfer Eligibility Rule prevents student-athletes from realizing the benefits of competing in NCAA Division I athletics for an entire academic year after transferring.  This does not prevent the student-athlete from practicing and participating in other team activities.  Practicing with one's teammates and competing on gameday, in front of the cameras and live crowds, are not the same thing.  The NCAA has often noted the importance of its student-athletes' opportunities to compete at the highest level:

> Student-athletes have the opportunity to travel across the country and around the world for regular-season contests, NCAA championships and foreign tours.  These experiences can open doors for the few who will

compete professionally and for the majority who will go pro in something other than sports.

The Value of College Sports, NCAA, https://www.ncaa.org/sports/2014/1/3/the-value-of-college-sports.aspx (accessed Dec. 11, 2023).

It takes one throw, one catch, one shot, one block to make a student-athlete a household name across the nation. Student-athletes are harmed by the Transfer Eligibility Rule and are not able to show the world the fruits of their labor in instances where they are forced to sit out a year of eligibility. In turn, this inhibits their ability to take advantage of NIL deals and positions, and limits potential earning based on professional league drafts.

Not only does the Transfer Eligibility Rule harm the student-athletes economically, but the Transfer Eligibility Rule impacts the student-athletes' overall mental well-being. All three (3) student athletes, RaeQuan Battle, Jarrett Hensley, and Noah Fenske, have alleged the Transfer Eligibility Rule has negatively affected their mental health. *See* [Doc. 1 at ¶ 49, 56, 65; Doc. 2-3 at ¶ 14; Doc. 2-4 at ¶ 9; Doc. 2-5 at ¶ 11].

In the NCAA Division I 2023–24 Manual, the NCAA highlights their "Commitment to Student-Athlete Well Being." In Bylaw 20.10.1.6, the NCAA states:

> Intercollegiate athletics programs shall be conducted in a manner designed to enhance the well-being of student-athletes who choose to participate and to prevent undue commercial or other influences that may interfere with their scholastic, athletics or related interests. The time required of student-athletes for participation in intercollegiate athletics shall be regulated to minimize

interference with their academic pursuits. It is the responsibility of each member institution to establish and maintain an environment in which student-athletes' activities, in all sports, are conducted to encourage academic success and individual development and as an integral part of the educational experience. Each member institution should also provide an environment that fosters fairness, sportsmanship, safety, honesty and positive relationships between student-athletes and representatives of the institution.

[Doc. 2-2 at 396]. The declarations by RaeQuan Battle, Jarrett Hensley, and Noah Fenske help show the harm the Transfer Eligibility Rule has caused these student-athletes.

### iii.   The Transfer Eligibility Rule harms consumers of college athletics.

The Transfer Eligibility Rule causes negative downstream effects on consumers of college athletics.  The value of the product that the NCAA provides to consumers is diminished when student-athletes are prevented from competing because of the Transfer Eligibility Rule.  As stated above, teams fight all year long for the best of the best student-athletes to join their rosters.  Teams may be less competitive without skilled transfer players which in turn harms consumers who lose the opportunity to see their college institutions compete to win on gameday.

This Court agrees that the Transfer Eligibility Rule "is a barrier to increased parity in college athletics that would create a better product for consumers.  The Transfer Eligibility Rule discourages transfer, which may benefit larger and historically successful sports programs by allowing them to retain talented players on their depth charts who may

15

otherwise wish to transfer and actually play elsewhere.  A more level playing field of talent among Division I institutions creates a more compelling product for consumers of college athletics.  The Transfer Eligibility Rule harms consumers by making teams less competitive by ruling that student-athletes are subject to the Transfer Eligibility Rule and must sit out a full academic year.

> ### iv.    The uncompelling "procompetitive justifications" for the Transfer Eligibility Rule are pretextual, and less restrictive alternatives could be implemented to accomplish the NCAA's purported "academic" goals.

The NCAA has asserted several arguments in an attempt to justify the continued implementation of its draconian, heavy-handed, "my way or the highway" Transfer Eligibility Rule.  First, the NCAA contends that the Transfer Eligibility Rule promotes the academic well-being of college athletes.  In guidance to student-athletes on the transfer process, the NCAA has stated that "[r]equiring student-athletes to sit out of competition for a year after transferring encourages them to make decisions motivated by academics as well as athletics.  Most student-athletes who are not eligible to compete immediately benefit from a year to adjust to their new school and focus on their classes."  NCAA Eligibility Center, *2018–19 Guide for Two-Year Transfers*, available at https://flc.losrios.edu/flc/main/doc/support-services/Counseling/NCAA_TransferGuide.pdf. (last accessed Dec. 11, 2023).

Next, the NCAA contends that restrictions like the Transfer Eligibility Rule preserve the amateurism model of the NCAA.  *See Alston*, 141 S.Ct. at 2152.  In the past, the NCAA has asserted that these restrictions help it "widen[ ] consumer choice by providing a unique product–amateur college sports as distinct from professional sports."  *Id*.

16

However, this Court is unpersuaded by the NCAA's arguments related to its purported attempt to preserve "amateurism." As noted by the district court in *In re National Collegiate Athletic Association Athletic Grant-in-Aid Cap Antitrust Litigation*, the NCAA has not even defined the nature of "amateurism," nor is it meaningfully defined within the organization's own constitution. 375 F.Supp.3d at 1071. Like the California district court, this Court cannot ascertain "any coherent definition" of this term, and apparently, it is not alone in this exercise. *Id.* at 1070–74 (noting the testimony of a former SEC commissioner stating that he has "never been clear on . . . what is really meant by amateurism") (internal quotation omitted).

The NCAA argues that the Transfer Eligibility Rule serves to promote the stability of a team's roster. However, nothing in the NCAA Bylaws prevents coaches from leaving or being fired mid-season. And, notably, the NCAA does not prevent first-time transfers in the NCAA. There is no meaningful distinction between a first-time transfer and second-time transfer in terms of a team's stability. Each time, the transfer student-athlete is joining a brand new roster. In sum, this Court finds the NCAA's stability argument to be without merit given that there are currently no restrictions on first-time transfers or coaches leaving.

These arguments are justifications in name only because they are pretextual and, even if valid, which they are not, could be accomplished through less restrictive alternatives as proposed by Plaintiff States.

While the NCAA maintains the Transfer Eligibility Rule is intended to help student-athletes progress towards a college degree, the Rule, in practicality, does very little

to help facilitate this goal.  The Transfer Eligibility Rule only prevents college athletes from competing with their team in NCAA athletic events; it does not prohibit participation in practices or other team activities, nor does it prescribe a certain number of hours that college athletes must spend on their studies during the academic year of residence when they are ineligible for competition.  Sitting out an entire year of practices, workouts, and other team events is not an option for student-athletes who want to maintain their standing as an NCAA Division I competitor in NCAA's gigantic, hyper-competitive sports business.  Thus, in reality, student-athletes subject to the Transfer Eligibility Rule devote the same amount of their time, if not more, to athletics as their teammates save for a few hours of actual competition on gameday.  *See* [Doc. 2-4 at ¶ 11; Doc. 2-5 at ¶ 9].  And the NCAA's argument that the point of the rule is based in academic performance is totally belied by the fact that no bylaw prevents freshman student-athletes, or first-year transfer student-athletes, from competing despite the challenges experienced by high school athletes and first-year student-athlete transfers in college academics and athletics.

Additionally, the Transfer Eligibility Rule does not aid the NCAA in maintaining consumer interest by promoting its "unique product" of amateur sports as distinct from professional sports.  As a matter of law, supposed benefits in the market for consuming college athletic events cannot counterbalance harms in the distinct, sport-specific markets for student-athlete labor.  This balancing approach "treats benefits to consumers (increased output) as justifying detriments to workers (monopsony pricing)."  ***Deslandes v. McDonald's United States, LLC***, 81 F.4th 699, 703 (7th Cir. 2023).  As identified by movants, this approach "is equivalent to saying that antitrust law is unconcerned with

competition in the markets for inputs, and *Alston* establishes otherwise." *Id*. Accordingly, this Court believes that consumers' supposed desire for college athletes to be shackled to their respective teams cannot balance against the harm caused to those students, who are situated no differently than any other worker in an employment context but for the NCAA declaring so by corporate fiat.

Even if this cross-market balancing was legally cognizable, which it is not, the Transfer Eligibility Rule has nothing to do with student-athletes maintaining amateur status. NCAA Bylaw 12.1.2 requires that Division I student-athletes maintain amateur status to be eligible for NCAA competition. Notably, nothing in the Transfer Eligibility Rule affects the amateur status of student-athletes under the NCAA's own definitions. Preventing student-athletes from competing in NCAA athletic events solely because they made a decision in their own best interest and transferred schools has no relationship with the amateur status of those athletes–instead, such athletes are merely transferring from one school as an amateur athlete to another school as an amateur athlete. The NCAA's arguments to the contrary are pretextual and do not justify such anticompetitive restrictions.

In addition, both the academic and amateurism goals of the NCAA, to the extent they can be discerned, are accomplished through less restrictive alternatives already in place within NCAA bylaws. For example, the bylaws already require student-athletes to maintain progress toward degrees to be eligible to compete in NCAA events. NCAA Bylaw 14.4.1 requires student-athletes to "maintain progress toward a baccalaureate or equivalent degree at that institution" to be eligible for intercollegiate competition at their college or university. NCAA Bylaw 20.2.4.13 requires member institutions to publish their

19

progress-toward-degree requirements for student-athletes, thereby making these requirements available to student-athletes at each institution.  Other NCAA bylaws require minimum credit hour and grade point averages for student-athletes to be eligible for competition.  And NCAA bylaw 14.5.5.3 prevents student-athletes from transferring mid-season and competing in the same sport they competed in at the previous institution within the same season.

These bylaws related to academic progress, GPA, and in-season transfers accomplish the NCAA's academic and amateurism goals without the unjustified restrictions imposed by the Transfer Eligibility Rule.

Within the relevant markets, the Transfer Eligibility Rule harms student-athletes by discouraging them from freely seeking the most beneficial institution for their well-being, limiting their options after the decision to transfer is made, and denying them the benefits of NCAA competition for an entire academic year.  Moreover, the Transfer Eligibility Rule harms consumers by decreasing the competitiveness of teams whose transfer players are ineligible under the Rule and by stifling increased parity in college athletics.  These negative and uncompetitive effects of the Transfer Eligibility Rule are apparent to this Court in the "twinkling of an eye."  Simply put, a rule of reason analysis of the Transfer Eligibility Rule reveals that it is the exact kind of unreasonable restraint of trade within labor markets that the relevant antitrust laws prohibit.  Accordingly, Plaintiff States have a strong likelihood of success on the merits of their Sherman Act claim.

**B.    Plaintiff States,[5] through harm to student-athletes in their respective states, are suffering and will continue to suffer irreparable harm without injunctive relief.**

Courts have repeatedly found that "[c]ollege students suffer irreparable harm when they are denied the opportunity to play sports." *S.A. v. Sioux Falls School Dist. 49-5*, 2023 WL 6794207, at *9 (D. S.D. Oct. 13, 2023) (quoting *Portz v. St. Cloud State Univ.*, 401 F.Supp.3d 834, 868 (D. Min. 2019); *see also McCormick ex rel. McCormick v. Sch. Dist. of Mamaroneck*, 370 F.3d 275, 302 n.25 (2d Cir. 2004); *Navarro v. Fla. Inst. of Tech., Inc.*, 2023 WL 2078264, at *16–17 (M.D. Fla. Feb. 17, 2023) (courts have consistently held that losing the opportunity to participate sports is irreparable harm); *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) ("Courts have consistently held that, given the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the opportunity to participate in their sport of choice on a continuous and uninterrupted basis."); *Brooks v. State Coll. Area Sch. Dist.*, 643 F.Supp.3d 499, 510 (M.D. Pa. Dec. 1, 2022); *Mayerova v. E. Mich. Univ.*, 346 F.Supp.3d 983, 997 (E.D. Mich. 2018); *but see Doe v. Portland Pub. Sch.*, 2023 WL 7301072, at *16

---

[5] Plaintiff States are granted authority to bring actions for injunctive relief under federal antitrust law pursuant to 15 U.S.C. § 26, which provides:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity, under the rules governing such proceedings, and upon the execution of proper bond against damages for an injunction improvidently granted and a showing that the danger of irreparable loss or damage is immediate, a preliminary injunction may issue. . . .

(D. Me. Nov. 3, 2023); ***Revesz v. Pa. Interscholastic Ath. Ass'n, Inc.***, 798 A.2d 830, 837 (Commonwealth Court of Pa. May 21, 2002).

Recognizing that student-athletes encounter circumstances that may make a transfer in a student-athlete's best interest, the NCAA in recent years expanded the exception to the Transfer Eligibility Rule to allow student-athletes seeking a first-time transfer to switch schools without penalty and to guarantee financial aid through graduation to transferring college athletes.  The NCAA has stated:

> "Like their peers in the general student population, college athletes choose to transfer for any number of reasons. . . ."  "We believe the changes enacted today enable member schools to adapt to students' needs, while also positioning students for long-term academic success. These changes to NCAA rules recognize further study is needed on graduation rates before we consider authorizing multiple transfer opportunities with immediate eligibility. We will continue to review potential modifications to transfer rules as the landscape evolves over time."

Meghan Durham, Division I Board Adopts Changes to Transfer Rules, NCAA (Aug. 31, 2 0 2 2 , 4 : 4 5 P M ) , https://www.ncaa.org/news/2022/8/31/media-center-division-i-board-adopts-changes-to-transfer-rules.aspx.

As NCAA notes, "further study is needed" to consider "authorizing multiple transfer opportunities with immediate eligibility."  NCAA does not have compelling evidence or data to justify differential treatment between first-time and multiple-time transfers.  Instead, it

appears to this Court that NCAA thinks it best to restrain the student-athletes now, and conduct further studies later to determine if the restraint was necessary. Without evidence to suggest that multiple-time transfers fare any better or worse academically than first-time transfers, NCAA should treat all student-athletes equally.

NCAA Division 1 student-athletes spend around 33 hours for Athletics, 35.5 hours for Academics, 14.5 hours for Socializing, and 85 hours on "Other" activities, including sleep, jobs, and other extracurriculars. NCAA, Time Management (Aug. 2023), available at: http://fs.ncaa.org/Docs/eligibility_center/Student_Resources/Time_Management_DI_DII_DIII.pdf; *see also* [Doc. 2-3 at ¶ 21 "Notably, I am still part of the team and still spend many hours a week practicing and engaging in other athletic activities, though I am not allowed to play in competitive games."; Doc. 2-4 at ¶ 11 "Although I am not able to compete, I continue to put in over 25 hours per week toward basketball activity, with my team and on my own. I am hopeful to get to play, so I spend a lot of time in the gym, alone, trying to make myself better."; Doc. 2-5 at ¶ 9 "I spent 20 hours preparing with my team each week, but I also spent voluntary hours preparing to play because I hope the NCAA would approve my waiver."].

The countable athletically related activities ("CARA") time limits under NCAA rules include supplemental workouts, competition, film review, practice, and strength and conditioning. Id. Competition, or gameday, is only a part of the time a student-athlete spends on athletics and is the only portion that the Transfer Eligibility Rule sees fit to interfere with. The refusal to allow multiple-time transfer student-athletes from competing

cannot be justified, seeing as the multiple-time transfer student-athlete does all training, film review, practice, etc. with the team besides the gameday.

> **i.**     **Student-Athletes in Winter Sports who are ineligible under the Transfer Eligibility Rule are facing current, immediate and irreparable damage through the denial of the opportunity to compete in NCAA athletic events**.

For winter sports, the Transfer Eligibility Rule has forced student-athletes to miss games which cannot be replayed. For example: WVU is playing thirty-one (31) regular season games this season. RaeQuan Battle has been unable to play in six (6) games so far. If he continues to sit out through December, he will miss an additional seven (7) games. The missed opportunities for these student-athletes in winter sports continues to mount. Missing regular season games constitutes a significant impact on the student-athletes' opportunities to develop as players in gametime conditions, develop in-game experience with their teammates, showcase their abilities to potential employers, and help their teams advance to their respective Conference Tournament and NCAA Tournament.

The success of a team in regular season dictates their entrance to their respective Conference Tournament and NCAA Tournament. Every game is crucial for a student-athlete and their team. Take, for example, March Madness. One good tournament run can cement a student-athlete or team's legacy in college sports. The absence of student-athletes from teams on gamedays could negatively impact a team's ranking and selection to tournaments. Moreover, it may have life-altering impacts on the student-athlete's ability to pursue NIL deals and a professional career in their sport as well as impacts on their mental health. The substantial and very current harm to winter sport Division I student-athletes is irreparable and cannot be easily remedied. However,

immediate temporary injunctive relief is necessary to allow these winter sport Division I student-athletes to compete on gamedays going forward in the season.

> **ii.   Student-athletes in spring and fall sports, all of whom are currently in their transfer window, are immediately and irreparably harmed by the Transfer Eligibility's Rule effect on transfer decisions and restriction of options of schools to which to transfer.**

All fall and spring sports are in an active transfer window.  NCAA, NCAA Division I Transfer Windows (Oct. 2023), available at: http://fs.ncaa.org/Docs/eligibility_center/Transfer/DIUG_Windows.pdf.  With the transfer window being open, student-athletes are facing the potential of a year of ineligibility should a student-athlete decide to transfer.  This potential may cause student-athletes to forgo opportunities to transfer that may be in their personal best interest.  Even more dire, this potential may prevent student-athletes from transferring due to situations totally outside of their control.  Without the restraint placed on student-athletes by the Transfer Eligibility Rule, student-athletes would be able to make the decision on whether to transfer solely based on what is in the student-athlete's best interest and free from the burden of weighing the risk of a year of ineligibility under the Rule.

Moreover, student-athletes would have more options of schools to which to transfer by not being under the restraint of the Transfer Eligibility Rule.  As noted above, the risk that a student-athlete may not be immediately eligible upon transferring could make a Division I institution less likely to offer that athlete a scholarship position.  Without the potential of being ineligible for a full academic year, this would put all student-athletes, regardless of the number of transfers, on equal footing.

25

C.     **The balance of the equities tip in Plaintiff States' favor.**

The balance of the equities supports Plaintiff States' Motion and favors issuance of a temporary restraining order and preliminary injunction enjoining the enforcement of the Transfer Eligibility Rule and the Rule of Restitution.   Student-athletes ineligible for competition under the Transfer Eligibility Rule face immediate and irreparable harm for every athletic contest they are forced to sit out, whether it be economic harm or well-being harm.

Student-athletes considering a transfer or already searching for a new institution are disadvantaged by the potential of a year of ineligibility under the Transfer Eligibility Rule. The equities favor allowing these student-athletes to realize the present and future economic potential of their participation in college athletics and allowing student-athletes in the transfer process to use the market to respond to changing circumstances and seek the most beneficial situation for their own well-being unencumbered by the ineligibility under the Transfer Eligibility Rule.

This Court does not see substantial harm to the NCAA that would result from this Court granting a temporary injunction.  A prohibition on enforcing the Transfer Eligibility Rule causes no harm to the NCAA or any other entity or individual.  Such relief would merely prevent the enforcement of one of the NCAA's many bylaws, allowing student-athletes to compete in athletic events already scheduled to take place.

The impact of injunctive relief would greatly benefit the student-athletes waiting to play their winter sport in the process of transferring or thinking about transferring.  The NCAA's own Preamble states it is "committed to the well-being and development of

26

student-athletes. . . ."  This Court sees no reason why allowing student-athletes who are already practicing with their respective teams to go to war on gamedays would harm the NCAA.

> **D.**   **Injunctive relief serves the public interest of promoting free and fair competition in labor markets.**

Temporary injunctive relief preventing the NCAA from enforcing the Transfer Eligibility Rule would serve the public interest in promoting free and fair competition in labor markets guaranteed by antitrust laws.  Free and fair competition in labor markets is essential to the American economy.  Protecting competition in the labor market for NCAA Division I student-athletes serves the public's interest in free and fair competition in labor markets.

> **E.**   **For this Court's injunctive relief to be effective, NCAA must be enjoined from enforcing NCAA Bylaw 12.11.4.2.**

NCAA Bylaw 12.11.4.2, commonly known as the "Rule of Restitution," provides:

> 12.11.4.2 Restitution.  If a student-athlete who is ineligible under the terms
> of the bylaws or other legislation of the Association is permitted to participate
> in intercollegiate competition contrary to such NCAA legislation but in
> accordance with the terms of a court restraining order or injunction operative
> against the institution attended by such student-athlete or against the
> Association, or both, and said injunction is voluntarily vacated, stayed, or
> reversed or it is finally determined by the courts that injunctive relief is not or
> was not justified, the Board of Directors may take any one or more of the

following actions against such institution in the interest of restitution and fairness to competing institutions:

(a)     Require that individual records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(b)     Require that team records and performances achieved during participation by such ineligible student-athlete shall be vacated or stricken;

(c)     Require that team victories achieved during participation by such ineligible student-athlete shall be abrogated and the games or events forfeited to the opposing institutions;

(d)     Require that individual awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(e)     Require that team awards earned during participation by such ineligible student-athlete shall be returned to the Association, the sponsor or the competing institution supplying same;

(f)     Determine that the institution is ineligible for one or more NCAA championships in the sports and in the seasons in which such ineligible student-athlete participated;

    (g)    Determine that the institution is ineligible for invitational and postseason meets and tournaments in the sports and in the seasons in which such ineligible student-athlete participated;

    (h)    Require that the institution shall remit to the NCAA the institution's share of television receipts (other than the portion shared with other conference members) for appearing on any live television series or program if such ineligible student-athlete participates in a contest selected for such telecast, or if the Board of Directors concludes that the institution would not have been selected for such telecast but for the participation of such ineligible student-athlete during the season of the telecast; any such funds thus remitted shall be devoted to the NCAA postgraduate scholarship program; and

    (i)    Require that the institution that has been represented in an NCAA championship by such a student-athlete shall be assessed a financial penalty as determined by the Committee on Infractions.

[Doc. 2-2 at 79–80]. The breadth of the Rule of Restitution is staggering and goes well beyond final adjudication on the merits in the NCAA's favor. It is in fact a measure designed to inhibit a person's access to the courts.

Knowing this, many Division I institutions will not permit the student-athlete to compete, even if a court issues a temporary restraining order or a preliminary injunction finding that those rules are likely illegal. This, in turn, deters student-athletes from challenging the NCAA's substantive eligibility rules, such as the Transfer Eligibility Rule.

It appears to this Court that the Rule of Restitution's purpose is to punish challenges to the NCAA's anticompetitive rules by attempting to deprive courts of the ability to grant effective relief and depriving individual student-athletes and member institutions of the practical ability to rely on court orders in their favor. The Rule of Restitution forces student-athletes to run the risk of severe personal punishment and the risk of subjecting their institutions or teammates to the harsh sanctions of the Rule of Restitution simply by following the terms of a court order. For instance, suppose this Court issues an injunction that allows a student-athlete, like RaeQuan Battle, to play for the remainder of the 2023–2024 basketball season. Suppose, hypothetically, WVU goes on to win the Big 12 Championship and National Championship. If this Court does not enjoin NCAA Bylaw 12.11.4.2, NCAA could require that WVU be stripped of the Big 12 and National Championship Titles, all over WVU following a court order instructing WVU that RaeQuan Battle is good to play on gamedays. Thus, this Court will enjoin NCAA from enforcing the Rule of Restitution against student-athletes and their respective institutions.

## IV.  Conclusion

The Motion **[Doc. 2]** is **GRANTED IN PART**. This Court hereby issues a temporary restraining order for **fourteen (14) days** and hereby **ORDERS** the NCAA is **ENJOINED** from enforcing the Transfer Eligibility Rule, NCAA Bylaw 14.5.5.1, insofar as it requires a transferor to sit out for an academic year of residence, and the Rule of Restitution, NCAA Bylaw 12.11.4.2 until a hearing on the Preliminary Injunction is heard on **<u>Wednesday, December 27, 2023, at 10:00 a.m.</u>**

Security will not be required prior to issuing a temporary restraining order because the NCAA will not suffer financial burden in compliance with such injunctive relief.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**: December 13, 2023.

JOHN PRESTON BAILEY
**UNITED STATES DISTRICT JUDGE**

31

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Clarksburg**

**STATE OF OHIO,
STATE OF COLORADO,
STATE OF ILLINOIS,
STATE OF NEW YORK,
STATE OF NORTH CAROLINA,
STATE OF TENNESSEE,** and
**STATE OF WEST VIRGINIA,**

                Plaintiffs,

      v.                                   **CIVIL ACTION NO. 1:23-CV-100**
                                                 Judge Bailey

**NATIONAL COLLEGIATE ATHLETIC
ASSOCIATION,**

                Defendant.

## <u>ORDER</u>

Pending before this Court is Parties' Joint Motion to Convert the Temporary Restraining Order to a Preliminary Injunction, to Vacate the Scheduled Preliminary Injunction Hearing, and to Vacate the Order for Expedited Discovery [Doc. 57], filed December 15, 2023. Therein, the parties state following consultation among the parties, they jointly request that this Court convert its Temporary Restraining Order into a Preliminary Injunction that will remain in place until this Court decides the merits of the above-styled case. The parties further request this Court vacate the currently scheduled preliminary injunction hearing set for Wednesday, December 27, 2023, at 10:00 a.m.

1

Moreover, the parties request that this Court vacate its Order granting leave for expedited discovery.  Thus, the Motion [**Doc. 57**] is **GRANTED** and this Court holds the following:

WHEREAS the Plaintiff States of Ohio, Colorado, Illinois, New York, North Carolina, Tennessee, and West Virginia filed a Complaint in this matter on December 7, 2023; and WHEREAS the Plaintiff States filed a Motion for a Temporary Restraining Order and Preliminary Injunction on December 7, 2023; and

WHEREAS, following a hearing on Plaintiffs' Motion on December 13, 2023, the Court issued a Temporary Restraining Order (Doc. 39) against Defendant National Collegiate Athletic Association ("NCAA") enjoining the enforcement of NCAA Bylaws 14.5.5.1 ("Transfer Eligibility Rule") and 12.11.4.2 ("Restitution Rule") for fourteen (14) days; and

WHEREAS the Court enjoined these rules to allow NCAA college athletes currently ineligible due to the Transfer Eligibility Rule to play during the time period covered by the Temporary Restraining Order; and

WHEREAS the Court has set a Preliminary Injunction hearing for December 27, 2023, and has entered an Order Granting Leave for Expedited Discovery [Doc. 55];

NOW THEREFORE to ensure that NCAA college athletes otherwise ineligible under the Transfer Eligibility Rule can compete in NCAA athletic events during the period of the Temporary Restraining Order with certainty as to the consequences of doing so, and in consideration of the recitals above, the Parties jointly stipulate and agree as follows:

1.     The Temporary Restraining Order [**Doc. 39**] issued by this Court on December 13, 2023, in this proceeding is hereby **ORDERED CONVERTED**

2

to a Preliminary Injunction that **shall remain in effect until a full and final trial and decision on the merits**.

2.      The NCAA shall take no action to retaliate against any athlete that participates in athletic competition during the period of this Preliminary Injunction, or the member institution that such athlete attends, based on the athlete's reliance upon the terms of this Preliminary Injunction.

3.      The preliminary injunction hearing currently set for **Wednesday, December 27, 2023, at 10:00 a.m.** is **CANCELED**.

4.      This matter shall be set for trial on the merits no sooner than the last day of competition in the 2023–24 winter and spring sports seasons and sanctioned tournament play.  This Court will issue a First Order and Notice following entry of this Order.

5.      The Order Granting Leave for Expedited Discovery [**Doc. 55**] is **VACATED**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**: December 18, 2023.

JOHN PRESTON BAILEY
**UNITED STATES DISTRICT JUDGE**

# EXHIBIT C



**December 18, 2023, Preliminary Injunction – Application Issues**

*Issued on December 18, 2023*

The following guidance is designed to assist the NCAA membership in understanding implementation issues associated with the temporary restraining order (TRO) issued by Judge John Preston Bailey of the Northern District of West Virginia on December 13, 2023, which was converted to a preliminary injunction on December 18, 2023. Additional issues will be addressed as needed.

**Question No. 1:** What is the preliminary injunction and how long will it remain in effect?

**Answer:** The 14-day TRO that was converted to a preliminary injunction enjoins the NCAA from enforcing NCAA Division I Bylaw 14.5.5.1, insofar as it requires a transfer student-athlete to sit out for an academic year of residence. The order also enjoins the NCAA from taking any action against an institution in the interest of restitution according to Bylaw 12.11.4.2, as it relates to the athletics participation of a student-athlete resulting from the injunction. The preliminary injunction will remain in effect for the remainder of the 2023-24 NCAA championship seasons.

**Question No. 2:** Does the preliminary injunction impact postgraduate transfer student-athletes who did not satisfy either Bylaw 14.6.1 or the NCAA Division I Committee for Legislative Relief previously approved waiver checklist for postgraduate transfer eligibility?

**Answer:** No. Postgraduate transfer student-athletes are not subject to a year in residence and must continue to satisfy Bylaw 14.6.1 or the previously approved waiver checklist at the time of transfer to be eligible to use their remaining eligibility at another Division I institution.

**Question No. 3:** Does the preliminary injunction enjoin the NCAA from enforcing Bylaw 14.5.5.1, as it relates to an undergraduate fall sport student-athlete who transfers midyear (spring 2024), seeking confirmation of the student-athlete's participation opportunity for the fall 2024 season?

**Answer:** It is not certain at this time whether the preliminary injunction will remain in effect during the 2024-25 season; however, as long as the undergraduate student-athlete transfers to another Division I institution during the 2023-24 academic year, the student-athlete will not be subject to Bylaw 14.5.5.1 during the 2024-25 academic year. The student-athlete would still be subject to any academic eligibility standards required for competition that may be developed or modified for the 2024-25 academic year.

**Question No. 4:** Does a four-year undergraduate transfer student-athlete need to be academically eligible (e.g., meeting applicable academic and amateurism requirements) to compete during the preliminary injunction?

**Answer:** Yes.

**Question No. 5:** Does the season of competition legislation apply if a student-athlete competes during the preliminary junction?

December 18, 2023, Preliminary Injunction
  – Application Issues Question and Answer Guide
Page No. 2
_____

**Answer:** Yes.  The preliminary injunction only enjoined Bylaw 14.5.5.1 and does not change the season of competition legislation.

**Question No. 6:** Will there be institutional repercussions or student-athlete reinstatement needed if a school chooses to allow a student-athlete who is subject to Bylaw 14.5.5.1 to compete during the preliminary injunction?

**Answer:** No, provided the student-athlete is otherwise eligible to compete (e.g., meeting applicable academic and amateurism requirements).

**Question No. 7:** Does the preliminary injunction impact other legislation that impacts undergraduate transfer student-athletes (e.g., notification of transfer – undergraduate student-athletes, competition in year of transfer, midyear enrollee – baseball, basketball and softball, receipt of athletically related financial aid in year of transfer – tennis, disciplinary suspension, two-year college transfer requirements or 4-2-4 requirements)?

**Answer:** No. The preliminary injunction only enjoins Bylaw 14.5.5.1.  It does not change the application of other undergraduate transfer legislation.

**Question No. 8:** May a first-time, four-year undergraduate transfer student-athlete who is currently subject to the year in residence (Bylaw 14.5.5.1) because they provided written notification of transfer after the transfer window(s) for their sport closed during the 2022-23 academic year and prior to August 1, 2023, compete during the preliminary injunction?

**Answer:** Yes, provided the student-athlete meets all applicable academic and amateurism requirements.

**Question No. 9:** May a four-year undergraduate transfer student-athlete who is currently subject to a year in residence (Bylaw 14.5.5.1) because they did not leave their previous four-year institution academically eligible compete during the preliminary injunction?

**Answer:** Yes, a student-athlete who did not qualify for the one-time transfer exception for failing to satisfy Bylaw 14.5.5.2.10-(b) could be eligible to compete for the remainder of the 2023-24 NCAA championship season(s) under the preliminary injunction provided the student-athlete is now meeting all applicable academic and amateurism requirements at their current institution (e.g., progress-toward-degree requirements).

**Question No. 10:** If an institution submitted an undergraduate legislative relief waiver that did not have a staff or committee decision as of December 18, 2023, will that legislative relief request be cancelled?

December 18, 2023, Preliminary Injunction
   – Application Issues Question and Answer Guide
Page No. 3
_____

**Answer:** Student-athletes who were not eligible for competition due to Bylaw 14.5.5.1 are no longer subject to a year in residence that would have otherwise been served during the 2023-24 academic year. Any legislative relief waivers that only request legislative relief of Bylaw 14.5.5.1 may be withdrawn by the institution.  On January 2, 2024, any submitted cases requesting relief of only Bylaw 14.5.5.1 will be cancelled by the NCAA staff case manager.

# EXHIBIT D



**JOSHUA H. STEIN**
**ATTORNEY GENERAL**

September 26, 2023

***Via Electronic Mail***

Charlie Baker
President, National Collegiate Athletics Association
700 W. Washington Street
P.O. Box 7110
Indianapolis, Indiana 46206-6222

### Re: Devontez Walker and the NCAA's Transfer Rules

Dear Mr. Baker:

I write to express my concern about the NCAA's decision to bar Devontez Walker from playing football for the University of North Carolina at Chapel Hill this season.  That decision is wrong—and likely illegal.

As you know, Mr. Walker has applied for a waiver of the NCAA's "year in residence" requirement for student-athletes.  That rule generally requires student-athletes who transfer schools to refrain from competition for one academic year after their transfer.  *See* NCAA Rule 14.5.1. But it carves out numerous exceptions—most notably, a broad exception for a student's first transfer from one four-year institution to another.  *See* NCAA Rule 14.5.5.2.10.

It is my understanding that the NCAA denied Mr. Walker's application for a waiver despite numerous considerations counseling against such a denial:

- *First*, Mr. Walker began his career as a student-athlete at North Carolina Central University. But Mr. Walker never actually played at N.C. Central because the 2020 season was cancelled due to the COVID-19 pandemic. Kent State University—the school where Mr. Walker moved after N.C. Central—is thus the only university where he has ever played a college football season.

- *Second*, Mr. Walker's decision to leave Kent State and transfer to UNC-Chapel Hill was finalized *before* the NCAA's Division I Council voted to approve legislation restricting the ability of student-athletes to secure waivers after transferring more than once. Mr. Walker made the decision to change schools with the reasonable expectation—based on your organization's well-documented policy of flexibility and accommodation in response to the COVID-19 pandemic—that he would be able to transfer and immediately play.

- *Third*, Mr. Walker's decision to leave Kent State was motivated in large part by mental-health struggles. The NCAA professes to care deeply about the student-athletes the organization regulates and indeed has carved out an express exception to the default transfer rules for scenarios where a student-athlete transfers "[f]or reasons related to the student-athlete's physical or mental health and well-being." NCAA Division I Committee for Legislative Relief, *Information Standards, Guidelines and Directives*, *available at* https://ncaaorg.s3.amazonaws.com/committees/d1/clr/D1CLR_Guidelines.pdf.

- *Fourth*, Mr. Walker decided to transfer in part to be closer to his family in North Carolina, particularly his ailing grandmother. I understand from public reporting that the NCAA just granted University of Minnesota football player Craig McDonald an exception to the two-transfer rule under similar circumstances.

- *Fifth*, Mr. Walker was a model student at Kent State—securing a 3.7 GPA—and has continued to be a model student since he arrived on campus at UNC-Chapel Hill.

Despite all of these mitigating factors, the NCAA has denied Mr. Walker the opportunity to play football at Carolina this fall. Not only is that decision wrong as a matter of common sense and decency, it is also likely unlawful.

Restricting Mr. Walker from playing at UNC-Chapel Hill this fall raises serious antitrust concerns as an illegal restraint of trade. In essence, the NCAA has imposed a sweeping, unilateral, one-year non-compete restriction, in violation of both state and federal law. *See, e.g.*, 15 U.S.C. § 1 (barring agreements in restraint of trade); N.C. Gen. Stat. § 75-1 (same, under North Carolina state law).

Just two years ago, in *Alston v. NCAA*, 141 S. Ct. 2141, 2156 (2021), a unanimous U.S. Supreme Court held that the NCAA is not "categorically exempt . . . from ordinary rule of reason review." *See also id.* at 2166-69 (Kavanaugh, J., concurring) (declaring that "[t]he NCAA is not above the law" and urging more searching scrutiny of the organization's rules). *Alston* confirms that the NCAA's rules are typically subject to a conventional "rule of reason" analysis and therefore must be supported by reasons that antitrust law determines to be "procompetitive." *Id.* at 2160.

It is exceedingly difficult, if not impossible, to justify the NCAA's decision to bar Mr. Walker from playing football at Carolina this fall as being procompetitive.

To start, the "year in residence" rule is now riddled with so many exceptions that the NCAA cannot plausibly substantiate the rule's prior justifications. Since April 2021, the rule requiring transfers to sit out a year has not been applied to a student-athlete's first transfer between schools. This glaring exception is a clear admission that transferring schools does not automatically jeopardize student-athlete welfare nor imperil college sports as a whole.

This is far from the only exception to the general rule that athletes must sit out a year following a transfer. Student-athletes can secure waivers from the "year in residence" rule for all

manner of reasons—when their major is discontinued or when they have suffered discrimination, to name just two.

To be clear, I take no issue whatsoever with the notion that the NCAA's categorical rules need exceptions and believe those exceptions should be applied liberally in appropriate circumstances. At the same time, the NCAA's exceptions—and the erratic manner in which they have been applied—make it difficult to accept that preventing Mr. Walker from playing football this fall produces any procompetitive benefits.

The only potential procompetitive justification for the transfer rule that would seem to have any persuasive force post-*Alston* is that the rule helps student-athletes remain on track to graduate because it gives them a chance to integrate on campus academically and socially before fully resuming the rigors of their sport. But that justification falls flat for Mr. Walker—he remains on track to graduate already and has maintained strong grades at every institution he has attended.

Furthermore, the NCAA transfer rule bars student-athletes only from competing, not from practicing or participating in other team activities. This approach recognizes the common sense proposition that elite athletes should not be expected to abandon their sport for a year to focus solely on academics and social life. But practice, not competition, typically constitutes the bulk of the time that a student-athlete spends on athletics. The NCAA will thus be hard-pressed to argue that denying Mr. Walker a transfer waiver was necessary to promote a focus on academics and campus integration, especially given that Mr. Walker is in good academic standing.

In any event, legitimate concerns about multi-transfer athletes' ability to graduate on time could plainly be addressed through a less categorical approach than the sweeping rule that has been applied to Mr. Walker. For instance, the NCAA could institute a rule that permits student-athletes who are on track to graduate to compete immediately following a transfer, but requires those who are not on track to wait.

This is precisely the kind of analysis that a court tasked with evaluating the NCAA's decision regarding Mr. Walker is likely to engage in. Such a court will undoubtedly struggle to conceive of any procompetitive benefit that could justify the anticompetitive restraint that the NCAA has imposed.

My concerns, moreover, extend beyond your decision to bar Mr. Walker from playing football at Carolina this fall. The NCAA's transfer rules, as applied to Mr. Walker's unique case, are unlikely to survive rule-of-reason review. But the transfer rules also seem likely to violate the antitrust laws more broadly.

I certainly agree the NCAA has a valid interest in differentiating college sports from pro sports. Nevertheless, numerous court decisions—including *Alston*—have made clear that it is loyalty among alumni and regional fans that ensures the popularity of college sports, not the NCAA's idiosyncratic and ever-changing rules about the metes and bounds of "amateurism." *See, e.g.*, *In re NCAA Grant in Aid Cap Antitrust Lit.*, 958 F.3d 1239 (9th Cir. 2020) *aff'd sub*

*nom. Alston v. NCAA*, 141 S. Ct. 2141 (2021); *O'Bannon v. NCAA,* 7 F.Supp.3d 955, 1001 (N.D. Cal. 2014), *aff'd in pertinent part*, 802 F.3d 1049 (9th Cir. 2015).

Given this new legal landscape and given my particular concerns about the NCAA's treatment of Mr. Walker, my office is considering the full range of options at its disposal to investigate the NCAA's potential antitrust violations. These options include issuing civil investigative demands to the NCAA, initiating an investigation alongside Attorney General Offices in my sister States, and pursuing litigation alleging violations of state and federal law.

While I will not hesitate to pursue these options should I decide that they are warranted, I stand ready to engage with the NCAA on a voluntary basis should the organization decide to do so. I would welcome a response by Friday, September 29, 2023.

Best Regards,

Josh Stein

# EXHIBIT E

**From:** Kevin Marino
**Sent:** Sunday, January 28, 2024 11:50 AM
**To:** mosborne@ncaa.org; sbearby@ncaa.org
**Cc:** John Boyle; Anthony Tagliaferro
**Subject:** Jeremiah Williams v. NCAA

Dear Ms. Forte-Osborne and Mr. Bearby:

Our law firm has been retained to represent Jeremiah Williams, a Rutgers University student-athlete, in a lawsuit against the NCAA for attempting to prevent Mr. Williams from beginning immediately to play for the Rutgers University Men's Basketball Team although he is eligible to do so under any fair reading of the applicable NCAA rules.  In so doing, the NCAA is denying Mr. Williams the opportunity to fulfill his obligations to Rutgers University and its Men's Basketball Team, to realize the full value of his name, image and likeness, and to maximize his chances to play professional basketball upon graduation.  If you wish to avoid litigation, which we intend to initiate by application for an Order to Show Cause with Temporary Restraints, please call me at (973) 715-5315.  I look forward to speaking with you.

Regards,

*Kevin H. Marino, Esq.*
Marino, Tortorella & Boyle, P.C.
437 Southern Boulevard
Chatham, NJ  07928-1488
Phone:  973-824-9300
Fax:  973-824-8425



# EXHIBIT F

**From:**          Kevin Marino
**Sent:**          Tuesday, January 30, 2024 9:10 AM
**To:**            Forte-Osborne, Michele
**Cc:**            Pottorff, Greg; Fort, Kimberly
**Subject:**       Re: Jeremiah Williams v. NCAA

Ms. Forte-Osborne,

Can you please explain how and why Mr. Williams is ineligible given that he has already sat out 19 games, the maximum penalty for his sports-wagering violation?

Thanks,
Kevin H. Marino, Esq.
Marino, Tortorella & Boyle, P.C.
437 Southern Boulevard
Chatham, NJ  07928-1488
Phone:  973-824-9300
Fax:  973-824-8425

On Jan 30, 2024, at 2:06 PM, Forte-Osborne, Michele <mosborne@ncaa.org> wrote:

Mr. Marino,

Your client, Mr. Williams,  is currently ineligible due to a violation of the NCAA's sports wagering rules.  As such, Mr. Williams will be ineligible for further intercollegiate competition, subject to appeal to the Committee on Student-Athlete Reinstatement for restoration of his eligibility. Rutgers University is currently working through the reinstatement process on behalf of Mr. Williams.  Rutgers University will receive notice when a reinstatement decision has been rendered.  Upon notice of decision, Rutgers University may accept the decision or file an appeal within 30 calendar days.  Rutgers University is best suited to provide you with updates regarding the restoration of Mr. Williams's eligibility.

Best regards,

 *Michele R. Osborne*

**Managing Director of Legal Affairs**
**Sr. Counsel, External & Membership Affairs**

w  317-917-6535   c  317—525-6773
P.O. Box 6222  |  Indianapolis, IN 46206-6222
ncaa.org

1

**From:** Kevin Marino <kmarino@khmarino.com>
**Sent:** Monday, January 29, 2024 5:32 PM
**To:** Forte-Osborne, Michele <mosborne@ncaa.org>
**Cc:** Pottorff, Greg <gpottorff@ncaa.org>; Fort, Kimberly <kfort@ncaa.org>
**Subject:** RE: Jeremiah Williams v. NCAA

Dear Ms. Forte-Osborne:

As you know, we represent Jeremiah Williams, a Rutgers University transfer student-athlete and a member of its Men's Basketball Team. During our telephone conference this morning, I advised you that Mr. Williams is prepared to file a Complaint against the NCAA seeking a temporary injunction permitting him to begin playing immediately for the Rutgers University Men's Basketball Team because (a) he has already served a suspension of more than 60% of the games Rutgers has played during the 2023-24 basketball season, the maximum penalty that could be imposed upon him for his sport-wagering offense under NCAA guidelines—specifically, wagering a total of $320 on college and professional sports; and (b) the NCAA cannot validly enforce its Transfer Eligibility Rule and Rule of Restitution against Mr. Williams or Rutgers given an Order entered in federal court in the Northern District of West Virginia.  In response, you advised me:  (1) that—contrary to information NCAA officials have shared verbally with Rutgers officials—the NCAA has yet to determine the sports-wagering penalty to be imposed upon Mr. Williams; and (2) that the NCAA's Transfer Eligibility Rule has only been enjoined, not declared invalid.

Regardless of whether the NCAA has formally advised Mr. Williams that his penalty for sports wagering will not exceed 60% of the games Rutgers will play this season, and despite our divergent views as to the significance of the court order enjoining the NCAA from enforcing the Transfer Eligibility Rule, two facts are beyond dispute:  Mr. Williams has already served the maximum penalty the NCAA will impose upon him for his sports-wagering offense by sitting out 19 games this season, and the NCAA cannot enforce its Transfer Eligibility Rule to prevent Mr. Williams from beginning to play immediately for the Rutgers University Men's Basketball Team, or penalize him or Rutgers under the NCAA Rule of Restitution for relying on the preliminary injunction entered against the NCAA In the United States District Court for the Northern District of West Virginia.  Accordingly, Mr. Williams respectfully requests that you acknowledge, by return email, that he has served his sports-wagering suspension and that he will not be further penalized for playing immediately for the Rutgers University Men's Basketball and that Rutgers University will not be penalized for permitting him to do so.  To be clear, Mr. Williams does not believe he needs the NCAA's express approval to do so, but asks that you provide it in an effort to resolve this dispute amicably and expeditiously.

Thank you for your attention to this matter.

Very truly yours,
<image001.png>
**Kevin H. Marino, Esq.**
Marino, Tortorella & Boyle, P.C.
437 Southern Boulevard
Chatham, NJ  07928-1488
Phone:  973-824-9300
Fax:  973-824-8425

**From:** Forte-Osborne, Michele <mosborne@ncaa.org>
**Sent:** Monday, January 29, 2024 12:32 PM
**To:** Kevin Marino <kmarino@khmarino.com>
**Cc:** Pottorff, Greg <gpottorff@ncaa.org>; Fort, Kimberly <kfort@ncaa.org>
**Subject:** RE: Jeremiah Williams v. NCAA

Mr. Marino,

As a follow-up to your question about service of process, please feel free to follow normal procedure in serving the NCAA.

Best regards,

<image003.png> *Michele R. Osborne*

**Managing Director of Legal Affairs**
**Sr. Counsel, External & Membership Affairs**

w  317-917-6535   c  317—525-6773
P.O. Box 6222  |  Indianapolis, IN 46206-6222
ncaa.org

---

**From:** Kevin Marino <kmarino@khmarino.com>
**Sent:** Sunday, January 28, 2024 11:50 AM
**To:** Forte-Osborne, Michele <mosborne@ncaa.org>; Bearby, Scott <SBearby@ncaa.org>
**Cc:** John Boyle <jboyle@khmarino.com>; Anthony Tagliaferro <atagliaferro@khmarino.com>
**Subject:** Jeremiah Williams v. NCAA

**Security** Warning
Be careful, the email's sending domain **"@khmarino.com"** has never been seen on your company's network before today.

Dear Ms. Forte-Osborne and Mr. Bearby:

Our law firm has been retained to represent Jeremiah Williams, a Rutgers University student-athlete, in a lawsuit against the NCAA for attempting to prevent Mr. Williams from beginning immediately to play for the Rutgers University Men's Basketball Team although he is eligible to do so under any fair reading of the applicable NCAA rules.  In so doing, the NCAA is denying Mr. Williams the opportunity to fulfill his obligations to Rutgers University and its Men's Basketball Team, to realize the full value of his name, image and likeness, and to maximize his chances to

play professional basketball upon graduation.  If you wish to avoid litigation, which we intend to initiate by application for an Order to Show Cause with Temporary Restraints, please call me at (973) 715-5315.  I look forward to speaking with you.

Regards,
<image001.png>
**Kevin H. Marino, Esq.**
Marino, Tortorella & Boyle, P.C.
437 Southern Boulevard
Chatham, NJ  07928-1488
Phone:  973-824-9300
Fax:  973-824-8425

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

---

This email has been scanned for spam and viruses by Proofpoint Essentials. Click here to report this email as spam.

4